**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **In Proceedings Under Chapter 11** |
| | ) | |
| **Broadway Ford Truck Sales, Inc.,** | ) | **Case No. 26-42179** |
| | ) | |
| **Debtor.** | ) | |

**DECLARATION OF DENNIS PHILLIPS IN SUPPORT OF**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

Dennis Phillips hereby declares under penalty of perjury:

1.      I am the president of Broadway Ford Truck Sales, Inc. ("Debtor") or ("Broadway"). As such, I am familiar with Debtor's day-to-day operations, business affairs, and books and records.

2.      On May 18, 2026 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      I submit this Declaration in support of the first day applications and motions in the Chapter 11 Case.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of Debtor's operations and financial condition or information reported to me in the course of my duties by Debtor's officers, agents, or employees.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration.

4.      Part I of this Declaration describes Debtor's business and the circumstances surrounding the filing of the Chapter 11 Case.  Part II sets forth the background of the purported

prepetition secured debt, and Part III sets forth the relevant facts in support of Debtor's various first day applications and papers filed concurrently herewith.

## I.   BACKGROUND

5.   Broadway is a Delaware corporation established in 1964, operating out of an 8.5-acre campus located at 812 E Taylor Avenue in St. Louis, Missouri. Broadway sells and services new and used Ford commercial vehicles. Its Ford Pro Elite Service Center boasts over 85,000 square feet of service capacity under one roof and 56 heavy truck bays.

6.   I am a former sales manager with Broadway, and I acquired the dealership in 2018.

7.   Over its six decades of operation, Broadway Ford earned significant recognition within the Ford dealer network and the broader commercial truck industry. The company received several local and national awards and maintained an active civic presence throughout the St. Louis area.

8.   Broadway's business is divided between commercial automotive sales and sales of parts and automotive servicing. Broadway serves a variety of institutional clients, including large utility companies, municipalities, and well-known local businesses.

9.   While Broadway has a history of strong sales figures and recurring institutional customers, the business has faced a number of challenges that ultimately led to its Chapter 11 bankruptcy filing.

10.   In 2017, shortly before my acquisition of the business, the dealership's service center and parts department were destroyed in a fire, and were provisionally moved to operate out of temporary locations. Broadway invested $600,000.00 in funds on legal fees, environmental due diligence, and architectural planning with the intent to build a new parts center, but ultimately was unable to move forward with the project, and the dealership later moved to a new location.

11.     In April 2022, Broadway relocated from its original location on South Broadway in the Soulard neighborhood of St. Louis to its current facility at 812 E. Taylor in north St. Louis City. In 2025, Broadway opened a Ford Pro Elite Service Center, one of only 68 such facilities nationwide and the only one within a 200-mile radius. The company invested approximately $5.6 million in the build-out, which was designed to support 50 or more technicians across its 56 bays.

12.     The debts associated with the build-out of the Ford Pro Elite Service Center created a significant additional cash burden for the business.

13.     In addition, the business also faced increased cash burn due to several unprofitable attempts at operational expansion. The company invested capital in ancillary product line inventory outside its core competency, which failed to sell as expected.  The company also launched the directfactoryparts.com e-commerce platform in 2024. Over approximately one year of operation, the platform contributed in excess of $500,000 in losses before being shut down in April 2026.

14.     Broadway has also faced difficulties in staffing its newly built service center, which has capacity for 56 technicians, but only staffs around twenty technicians due to a nationwide shortage. While the dealership operated with a shortage of technicians during the lead up to its bankruptcy, it was simultaneously overstaffed in other departments, with a headcount of 89, up from only 56 prior to moving to the new location in 2022.

15.     All of these factors created a situation in which additional working capital was needed. Broadway turned to non-traditional merchant cash advance lenders after exhausting traditional sources of funds. The terms of the merchant cash advance loans were onerous and created the need for additional loans to be taken out to service the existing loans. In March of 2026,

the dealership was paying $95,000.00 per day to a single merchant cash advance lender and paid over $2 million to such lender during this month alone.

16.     Throughout these issues, Broadway also carried excessive vehicles on its floorplan, which created increased interest expenses and caused the dealership to eventually fall behind on its payments to Ford Motor Credit Company ("FMCC") and became out of compliance with its floorplan financing.

17.     Broadway's financial situation prior to filing was dire. The dealership was out of compliance with its floorplan and owed several million dollars to FMCC. Several merchant cash advance lenders sought to collect on their claims and pursued judgments or payments from Broadway's customers. All of this created an immediate need to commence this Chapter 11 case.

18.     In preparation for the Chapter 11 filing, Broadway Ford has taken several significant operational and organizational steps. The company has reduced its headcount by approximately 15%, with a targeted reduction of 20% by month-end, reducing total employment from a high of 89 to the low 70s. The Company has shut down an unprofitable e-commerce parts platform that was the source of consistent losses.

19.     Management has also been restructured. The company terminated the employment of its former President. Jim Schaeffer has been appointed General Manager, Tim Valley has been named interim CFO, and Taylor Cook has assumed the role of Fixed Ops Director. Greg Kelly, the company's prior General Counsel, will serve as Chief Restructuring Officer to oversee the Chapter 11 proceedings.

20.     The business has renewed and singular focus on its core competencies, the sales, parts, and service of commercial vehicles, and is the only Ford Pro Elite Service Center within a 200-mile radius. Broadway Ford's six-decade legacy of award-winning customer service, its

established relationships with major regional fleet operators, and its state-of-the-art facility provide a strong foundation for the next chapter of the business.

21.     In the weeks leading up to the bankruptcy, Broadway has interfaced with a number of potential purchasers in pursuit of a sale of all business assets. Broadway intends to use the Chapter 11 process to continue these efforts to sell the business to a new owner.

## II.     DEBTOR'S PREPETITION SECURED DEBT

22.     Debtor is indebted to FMCC, which holds a first-position lien on cash collateral and on Debtor's vehicle inventory. Varilease Finance, Inc. holds a first position interest in certain of Debtor's equipment used within Debtor's servicing department. Debtor believes that Moneywell GRP, LLC, Ocean Funding Corp., Gulfstream Capital Solutions LLC, and St. Louis Bank may claim a junior interest on cash collateral and/or other assets. Debtor is evaluating the extent and validity of any claimed junior liens.

## III.     MOTIONS AND APPLICATIONS

23.     An important element of Debtor's successful Chapter 11 Case is approval of each of Debtor's motions and applications submitted concurrently herewith.  Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

### Retention of Carmody MacDonald P.C.

24.     Continued representation of Debtor by their counsel, Carmody MacDonald P.C. ("**CM**"), is critical to the success of Debtor's Chapter 11 proceedings because CM is uniquely familiar with Debtor's business and legal affairs as more fully set forth in Debtor's *Application for Entry of an Order Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014(a) Authorizing the Employment of Carmody MacDonald P.C. as Counsel* and the *Declaration of Thomas H. Riske in*

*Support of* Debtor's *Application for Entry of an Order Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014(a) Authorizing the Employment of Carmody MacDonald P.C. as Counsel* (the "**Riske Declaration**").

25.     Debtor selected the firm of CM as attorneys because of the firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

26.     Debtor desires to employ the firm of CM because of the extensive legal services that will be required in connection with the Chapter 11 Case.

27.     The services of attorneys under a general retainer are necessary in order to enable the Debtor to faithfully execute its duties as debtor in possession.  Subject to further order of this Court, CM will be required to render, among others, the following services to the Debtor:

    a.     Advising Debtor with respect to its rights, power, and duties in this Chapter 11 Case;

    b.     Assisting and advising Debtor in its consultations with any appointed committee relative to the administration of this Chapter 11 Case;

    c.     Assisting Debtor in analyzing the claims of creditors and negotiating with such creditors;

    d.     Assisting Debtor with investigation of the assets, liabilities, and financial condition of Debtor and reorganizing Debtor's business in order to maximize the value of Debtor's assets for the benefit of all creditors;

    e.     Advising Debtor in connection with the sale of assets or business;

    f.     Assisting Debtor in its analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

    g.     Assisting and advising Debtor with respect to any communications with the general creditor body regarding significant matters in this Chapter 11 Case;

    h.     Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtor;

i.  Reviewing, analyzing, or preparing, on behalf of Debtor, all necessary applications, motions, answers, orders, reports, schedules, pleadings, and other documents;

j.  Representing Debtor at all hearings and other proceedings;

k.  Conferring with other professional advisors retained by Debtor in providing advice to Debtor;

l.  Performing all other necessary legal services in this Chapter 11 Case as may be requested by Debtor in this Chapter 11 Case; and

m.  Assisting and advising Debtor regarding pending arbitration and litigation matters in which Debtor may be involved, including continued prosecution or defense of actions and/or negotiations on Debtor's behalf.

28.  The firm of CM has indicated a willingness to act on behalf of the Debtor.

29.  To the best of Debtor's knowledge, Thomas H. Riske and the other members, counsel, and associates of the firm of CM (i) do not have any connection with the Debtor, its affiliates, creditors, or any other parties-in-interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the Riske Declaration filed concurrently herewith.

**Cash Collateral**

30.  Debtor requires the immediate use of Cash Collateral to continue its business operations and to pay its regular daily expenses, including utilities and other costs of doing business.

31.  Debtor does not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of the Cash Collateral. Debtor's immediate ability to preserve and otherwise finance their operations is essential to Debtor's continued viability.

32.     Absent the requested relief, Debtor will be unable to pay their operating expenses and to otherwise operate their business and preserve their assets.  Immediate and irreparable harm to Debtor's business and to the value of their estates will occur absent the relief requested herein.

33.     FMCC has a first-position interest in cash collateral and a first-position interest in Debtor's vehicle inventory.

34.     Debtor and FMCC have agreed to a stipulation governing Debtor's use of cash collateral, Debtor's sale of vehicle units, and allowing certain operational oversight by FMCC.

35.     The terms set forth in the *Motion for Entry of Interim and Final Order Authorizing (I) Use of Cash Collateral and the Terms of the Stipulation Between Debtor and Ford Motor Credit Company, LLC and (II) Setting Final Hearing for Use of Cash Collateral* (the "**Cash Collateral Motion**"), including the customary terms under which FMCC will receive certain security interests, are fair and reasonable under the circumstances and protect the affected lenders from any diminution in value of their respective security interests. Thus, Debtor believes the entry of an order granting the interim and final relief requested in the Cash Collateral Motion is in the best interest of their estates and creditors.

### Cash Management

36.     Debtor maintains a cash management system (the "Cash Management System") in the ordinary course of business.  The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage cash in a cost effective, efficient manner.  Debtor uses the Cash Management System in the ordinary course of its business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  Debtor maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and

releasing funds.  Additionally, Debtor regularly reconciles its books and records to ensure that all transfers are accounted for properly.

37.    Debtor's cash management system is facilitated through its accounts with St. Louis Bank. Any disruption to Debtor's cash management system would prejudice Debtor's businesses.

38.    Debtor seeks authority to open debtor in possession accounts and maintain the Cash Management Systems with the funds currently held in St. Louis Bank.

39.    The terms set forth in *Debtor's Motion for Entry of an Order Authorizing Debtor to Maintain Cash Management System*  (the "**Cash Management Motion**") further outline the relief requested.

### Insurance Motion

40.    Debtor maintains various insurance policies (collectively, the "**Insurance Policies**") through third-party insurance carriers (the "**Insurance Carriers**") as set forth in Exhibit A to *Debtor's Motion for Authority to Maintain Existing Insurance* (the "**Insurance Motion**").

41.    By the Insurance Motion, Debtor seeks authority to maintain the Insurance Policies and practices related thereto.  Debtor also seeks authority to pay any obligations that come due under the Insurance Policies, including premiums and fees.

42.    The Insurance Policies provide Debtor with essential insurance coverage.  Any interruption in such coverage would expose Debtor to serious risks, including:  (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers; (c) the possible inability to obtain similar

types and levels of insurance coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage.

43.     For these reasons, Debtor believes that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Carriers clearly is in the best interests of Debtor, its estate, and its creditors.  Accordingly, Debtor seeks authority to pay all of the post petition installment payments as they come due.

## Utilities

44.     In connection with the operation of its business, Debtor obtain internet, telephone, and other similar services from several utility companies or utility divisions.  Any interruption in these services would seriously disrupt Debtor's normal day-to-day operations, thereby causing potential irreparable harm to Debtor's reorganization.  Exhibit A to *Debtor's Emergency Motion for an Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (1) Prohibiting Utilities Companies from Altering, Refusing, or Discontinuing Utility Services; and (II) Deeming Utilities Companies Adequately Assured of Future Performance* (the "Utilities Motion") is a list of all the utility companies that currently provide services to Debtor.

45.     The Utility Companies service Debtor's facilities and the Utility Services are essential to Debtor's ability to reorganize.

46.     In general, Debtor has established a good payment history with virtually all the Utility Companies and have made payments on a regular and timely basis.  To the best of Debtor's knowledge, there are no material defaults or arrearages of any significance with respect to Debtor's undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of the Chapter 11 Case.

47.     No Utility Company currently holds a deposit from Debtor.

48.     Debtor believes that the establishment of a deposit equal to two (2) weeks of Debtor's estimated monthly cost of the Utility Services constitute adequate assurance of payment to the Utility Companies and is sufficient to preclude unilateral termination by a Utility Company under 11 U.S.C. § 366(b) and (c).

49.     Debtor will pay all post petition utility bills when due.  If any delay occurs, Debtor believes that the proposed assurances will more than provide sufficient protection to the Utility Companies providing post petition services.

## Wages

50.     Debtor has requested authority to pay outstanding prepetition employee wages and benefits under the Emergency Motion for Order Authorizing Payment of Prepetition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits (the "Wage Motion").

51.     Failure to pay the prepetition employee claims (the "Prepetition Employee Claims") as described and identified in the Wage Motion would cause Debtor's employees to suffer undue hardships and, in many instances, financial difficulties because such amounts are necessary to enable employees to meet their respective personal, household and family obligations. Such a result would obviously destroy employee morale and result in unmanageable employee turnover.  Debtor submits that any significant deterioration in morale at this time will substantially and adversely impact Debtor and its ability to reorganize, thereby resulting in immediate and irreparable harm to Debtors and its estate.

52.     Debtor submits that the amounts to be paid to employees pursuant to the Wage Motion are reasonable compared with the importance and necessity of the services of the employees and the losses Debtor will likely suffer if those amounts are not paid.

11

53.     The requested relief also will significantly reduce the administrative burden which otherwise might be imposed in this Chapter 11 Case.  For Debtor to identify whether and to what extent individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expense which seem unwarranted under the circumstances of this case.

Dated: May 21, 2026

 */s/ Dennis Phillips*
Dennis Phillips