**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **In re:** | ) | **Case No. 26-42179-357** |
|  | ) | **Chapter 11** |
| **BROADWAY TRUCK SALES, INC.,** | ) |  |
|  | ) |  |
| **Debtor.** | ) |  |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION
TO DEBTOR'S MOTION FOR USE OF CASH COLLATERAL**

The Official Committee of Unsecured Creditors of Broadway Truck Sales, Inc. (the "**Committee**"), by its undersigned proposed counsel, hereby files this Limited Objection (the "**Objection**") to the *Motion for Entry of Interim and Final Orders Authorizing (I) Debtor's Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code and the Terms of the Stipulation Between Debtor and Ford Motor Credit Company LLC, and (II) Setting Final Hearing for Use of Cash Collateral*, which was filed on May 18, 2026 [Dkt. No. 3] (the "**Cash Collateral Motion**").

In support of the Objection, the Committee states as follows:

**BACKGROUND**

1.      On May 18, 2026 (the "**Petition Date**"), Broadway Truck Sales, Inc. (the "**Debtor**") filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Court**") commencing this chapter 11 case (the "**Chapter 11 Case**").

2.      On June 4, 2026, the United States Trustee filed the *Notice of Appointment of Official Unsecured Creditors' Committee* [Dkt. No. 76], as amended on June 8, 2026 [Dkt. No. 79], forming the Committee.

1

3.      On May 18, 2026, Debtor filed the Motion seeking interim and final orders authorizing to use Cash Collateral on the terms set forth in the stipulation (the "**Stipulation**") by and between Debtor and Ford Motor Credit Company LLC ("**Ford Credit**").

4.      The Court entered its first Interim Order approving the Motion and Stipulation on May 22, 2026 [Dkt. No. 38] (the "**First Interim Order**") with respect to the Debtor's use of Cash Collateral and; further entered the second Interim Order [Dkt. No. 77] (the "**Second Interim Order**," and with the First Interim Order and subsequent interim orders approving the use of Cash Collateral, the "**Interim Orders**").

5.      The Cash Collateral Motion is inextricably tied to the Stipulation. The Interim Orders all incorporate and approve the Stipulation on an interim basis. The Debtor now seeks an order approving the Cash Collateral Motion and the Stipulation on a final basis (the "**Cash Collateral Order**") to allow the Debtor to continue using cash collateral ("**Cash Collateral**") to fund operations and this Chapter 11 Case.

6.      On June 12, 2026, the Debtor filed its schedules of assets and liabilities and statements of financial affairs [Dkt. No. 93] (the "**Schedules and Statements**").  In the Schedules and Statements, the Debtor scheduled over $23 million of general unsecured claims (the "**GUC Claims**"), of which approximately $880,000 may be priority claims.  Ford Credit is scheduled with a secured claim of approximately $34 million.  Upon information and belief, Ford Credit is undersecured and will likely have a significant GUC Claim – potentially $10 million – making the Committee the largest creditor body in this Chapter 11 Case.

7.      A hearing on the Cash Collateral Order is set for June 17, 2026.

## LIMITED OBJECTION TO USE OF CASH COLLATERAL

8.      The Committee, as representative for general unsecured creditors, has a material interest in a value-maximizing resolution to this Chapter 11 Case.  The Committee supports the

2

Debtor's effort to preserve value and the Committee recognizes that the Debtor requires the use of Cash Collateral, if not new money, to fund operations and administer this Chapter 11 Case. While the Committee has provided revisions to the Cash Collateral Order to the Debtor and Ford Credit, there remains outstanding business and legal issues that must be resolved before the Cash Collateral Order is entered on a final basis.

9. The Committee recognizes that many of these terms are part of the bargain that Ford Credit requires for use of Cash Collateral, but the Cash Collateral Order falls well short of protecting the interests of unsecured creditors. Accordingly, the Cash Collateral Order and Stipulation should be denied because it confers significant benefits to Ford Credit that go beyond protecting Ford Credit's secured claim and is not in the best interests of creditors or the estate.

10. The Committee has the following objections to terms in the proposed final Cash Collateral Order and this Chapter 11 Case that must be satisfactorily addressed before the Cash Collateral Order is entered on a final basis.

A. **<u>The Debtor Must Present a Budget that Funds this Chapter 11 Case</u>**

11. The budget attached to the Cash Collateral Motion and the Interim Orders (the "**Budget**") is insufficient to analyze the cash needs and operations of the Debtor and this Chapter 11 Case and indicates a clear need for additional funding that Ford Credit is not currently providing. In the Interim Orders, the Budget was for a very limited period (*e.g.*, one to two weeks) and the Debtor only recently provided a 13-week Budget. The 13-week Budget provided still contains various issues and questions that must be addressed before it can be finalized. Importantly, there must be clarity what the Debtor intends to do in this Chapter 11 Case and how it will be funded.

a. **This Chapter 11 Case Must Be Funded to Confirmation.**

3

12.    While the Debtor has not filed a sale motion, the Stipulation requires the Debtor to obtain binding letters of intent ("**LOI**") and purchase agreements by certain dates – intimating that this Chapter 11 Case is designed to sell the Debtor's assets pursuant to the protections of section 363 of the Bankruptcy Code. *See* Stipulation, ¶ 4.j. There, however, is not a clear plan regarding what happens after a sale transaction is consummated.

13.    Parties obtaining the benefit of section 363 of the Bankruptcy Code must pay for the full freight of this Chapter 11 Case's cost. This Chapter 11 Case cannot turn into one where the Debtor's assets are sold – allowing a buyer to acquire the assets free and clear of general unsecured claims and transferring substantially all of the sale proceeds to Ford Credit – and the Debtor is left with an unreasonably small amount of cash to consummate a value-maximizing plan. If Ford Credit wants a going concern sale process in Chapter 11, it must "pay the freight" for the cost of this Chapter 11 Case.

14.    Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself. *See* 11 U.S.C. § 506(c). This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries. *See*, *e.g.*, *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to

4

unsecured creditors"). Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee, or other party-in-interest to exclude postpetiton proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of what is tantamount to a secured lender's foreclosure sale. *See* 11 U.S.C. § 552(b).

15. Simply put, the costs of this Chapter 11 Case, including liquidating Ford Credit's Collateral, must be set forth in the Budget – which it does not currently provide for. If the Debtor, Ford Credit, and/or a purchaser intends to obtain the benefit from a section 363 sale without paying the cost of this Chapter 11 Case, then the Court should consider whether conversion of this Chapter 11 Case is the value-maximizing option for the Debtor's estate.

### b. The 13-Week Budget Must Be Clarified and Provide an Appropriate Carveout.

16. The 13-week Budget provides for the following assumptions, to which the Committee has received no evidence that these assumptions will become reality. In addition to Cash Collateral, the 13-week Budget provides that (a) STL Growth will fund $60,000 during the week ending July 3, 2026, (b) the Debtor will receive customer receivables of approximately $67,000, and (c) the Debtor will obtain $575,000 from DIP financing or a purchaser. These assumptions must be drilled down upon for several reasons.

17. *First*, the Schedules and Statements do not list any receivables owed to the Debtor. *See Schedule A/B: Assets-Real and Personal Property*, Part 3. This is particularly confusing because the Committee understands that the Debtor is owed over $7 million in receivables from STL Growth and/or other entities owned by the Debtor's insiders. There must be clarity regarding the Debtor's financial records to understand the scope of the receivables that are available for recovery and the amount STL Growth (and other entities owned by the Debtor's

insiders) must return to the Debtor. *Second*, the Committee is not aware of any agreement with Ford Credit, a prospective purchaser, or another party that would provide funding for this Chapter 11 Case through DIP financing or a purchase price.

18. Further, the Cash Collateral Order, Stipulation, and Budget must provide for an appropriate carveout for estate professionals (the "**Carveout**"). Reasonable carveouts are "designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced." *Ames*, 115 B.R. at 38; *see also In re Cottrell Int'l, LLC*, No. 00-13592, 2000 WL 1180282, at *3 (Bankr. D. Colo. July 19, 2000) (bankruptcy courts should not unduly restrict the availability of funds to pay professionals in the case, including counsel for the creditors' committee).

19. The 13-week Budget provided by the Debtor provides zero information as to how "Legal & Professional Fees," totaling $130,000, are allocated among the Debtor's and Committee's professionals. Indeed, the Committee understands that this amount only includes fees budgeted for the Debtor's professionals. To ensure the Committee's professionals do not have to "compete" with the Debtors' professionals for limited fees allocated in the Budget, the Committee should receive its own line item in the Budget for the fees of Committee professionals. Further, the Court should require the amount budgeted for the Committee's professionals be an amount that is realistic and appropriate under these circumstances. The Court should not approve a final Cash Collateral Order until the Debtor provides an itemized budget by professional that reflects reasonable and sufficient amounts for the Committee's professionals to perform their fiduciary duties in these Chapter 11 Cases.

6

**B.      Unencumbered Assets Must be Protected from Liens and Super Priority Claims**

20.      Given the amount of alleged secured debt in this case, it is imperative for unsecured creditors that the Debtor's unencumbered assets are not encumbered, either directly or indirectly, through the Cash Collateral Order.   There are two buckets of unencumbered assets that the Committee seeks to protect from liens and claims under the Cash Collateral Order:  (a) avoidance actions (and the proceeds thereof) under Chapter 5 of the Bankruptcy Code including, without limitation, claims under §§ 544, 547, 548, 550 and 551 of the Bankruptcy Code (the "**Avoidance Actions**"), and (b) other assets of the Debtor's estates that are unencumbered as of the Petition Date.

21.      The Stipulation proposes to provide Ford Credit with Replacement Liens (as defined in the Stipulation) and super priority claims ("**Super Priority Claims**") in all of the Debtor's assets as adequate protection.  *See* Stipulation, ¶¶ 4.a.-b.  Further, the Stipulation expressly provides that Ford Credit is to receive the net proceeds from any Chapter 5 causes of action against the Debtor's merchant or factor lenders.  *See id.*, ¶ 4.n.  The Stipulation shifts unencumbered value to Ford Credit in a manner that is fundamentally at odds with the unique purpose served by Avoidance Actions and, with respect to the Replacement Liens, does not require Ford Credit to show actual diminution in value to the Cash Collateral for Ford Credit to receive the benefit of these unencumbered assets.

22.      The Court should limit the requested Replacement Liens and Super Priority Claims in five ways.  *First*, the purpose of adequate protection is not to allow a secured lender to *enhance* its collateral. *See In re W. Nottingham Acad. in Cecil Cnty.*, 662 B.R. 103, 115 (Bankr. D. Md. 2024) ("[A]dequate protection is not intended to increase the creditor's rights or provide the creditor with more value than supported by the collateral.") (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Ass'n*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)).

7

Rather, the purpose is to ensure that prepetition lenders receive the security they bargained for prior to the petition date, or to preserve the secured creditor's position following the commencement of a bankruptcy case. *See, e.g.*, *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment. Before the plan is confirmed, that property right is protected by the requirement of [Bankruptcy] Code section 361 for adequate protection.").

23.     A creditor is required to show, at the appropriate time, that the value of its cash and non-cash collateral, when considered in the aggregate, has diminished as a result of the bankruptcy case. *See* 11 U.S.C. § 363(p)(2) (providing that any entity asserting an interest under section 363 "has the burden of proof on the issue of the validity, priority, or extent of such interest"). Accordingly, as is customary, Ford Credit should only receive adequate protection liens or claims to the extent of any actual diminution in value of their Cash Collateral *after* the Petition Date.

24.     *Second*, if Ford Credit would like to share in the Debtor's unencumbered assets, including the Avoidance Actions, Ford Credit can pay to acquire such a right. Currently, no new money is being provided to the Debtor by Ford Credit to fund operations or this Chapter 11 Case. Ford Credit, which is currently contemplated to receive all of the benefit of this Chapter 11 Case, must provide cash benefits if it wants to expand its pre-Petition Date collateral package.

25.     *Third*, to the extent the Court agrees to the grant of the "adequate protection" liens and claims, then Ford Credit should be required to marshal against any assets that are encumbered as of the Petition Date before asserting such lien or claim against unencumbered collateral. As such, accessing the unencumbered collateral only occurs as a "last resort" under

8

very limited circumstances, protecting the interests held by unsecured creditors as of the Petition Date.

26.     *Fourth*, the Replacement Liens and Super Priority Claims must be subject and junior to the Carveout.  The Stipulation provides that the Super Priority Claims will have priority over all unsecured and administrative claims.  *See* Stipulation, ¶ 4.b.  As noted above, Ford Credit cannot obtain the benefit from this Chapter 11 Case, including the benefit of professional services, without paying the cost related to those benefits.  Any Replacement Liens and Super Priority Claims must be subject and junior to the Carveout.

27.     *Fifth*, any final Cash Collateral Order should clarify that all "adequate protection" payments of interest and professional fees should be subject to both (a) re-characterization as payments of principal, or (b) disgorgement, as applicable, in the event that the Lenders are determined to be undersecured or unsecured, whether under § 506(a) of the Bankruptcy Code or pursuant to the Committee's Lien Challenge rights.

28.     The Committee requests that any final Cash Collateral Order must either exclude unencumbered assets, including Avoidance Actions, from the Replacement Liens and Super Priority Claims or provide the protections identified herein.

## C.     The Waiver of Estate Claims Against Ford Motor Credit Is Not in the Best Interests of Creditors or the Estate.

29.     In the Stipulation, the Debtor and Ford Credit stipulate that prepetition payments made to Ford Credit were made with Ford Credit Collateral and did not diminish any property available for unsecured creditors. Stipulation ⊮ 2.k.  This stipulation, should it be approved by the Court, would essentially waive any preference claim that the Debtor may have against Ford Credit under section 547 of the Bankruptcy Code.

9

30.     The Committee was appointed around ten (10) days ago and has not yet had the opportunity to conduct a thorough investigation of the Debtor's prepetition dealings. If the Committee discovers that payments were made to Ford Credit using property outside the scope of their alleged liens, then it is possible that the Debtor could avoid those payments under section 547, especially if Ford Credit is undersecured, which the Committee believes is the case. However, since the Committee's ability to bring these claims would be derivative, the Debtor's stipulation with respect to prepetition payments could severely prejudice the Committee's ability to recover those payments for the benefit of the Debtor's estate and unsecured creditors.

31.     Similar prejudice would result if the Court approved the Debtor's general waiver of claims against Ford Credit. The Stipulation provides that the Debtor waives all claims it has against Ford Motor Credit. Stipulation ⁋ 2.j. Not only does this broad language appear to include any prepetition claims, but also any chapter 5 claims as well. As noted above, this waiver risks stripping the Committee of the ability to recover on these claims before the Committee has even had the chance to investigate them.

32.     All of this is made worse by the fact that the Stipulation states that it binds the Committee to the stipulations above subject only to the Committee's Lien Challenge rights, which give the Committee 60 days to challenge Ford Credit's claims and lien. Stipulation at ⁋ 5. Importantly, the challenge rights do not include the right to challenge Ford Credit with respect to any preference or other estate cause of action.

33.     To ensure that the Committee is given a fair opportunity to investigate the prepetition affairs of the Debtor and any claims it may have against Ford Credit, the Cash Collateral Order should provide some form of protection to the Committee against the Debtor's broad waiver of claims.

10

34.     This protection could include a lookback period commensurate with the challenge period whereby the waivers do not take effect against the Debtor until 60 days after the Stipulation is approved; or it could expressly reserve the Committee's right to seek these claims as a part of its challenge rights. Courts have noted that both of these methods are ways of balancing the need of the debtor to quickly obtain use of cash collateral with the Committee's interest in bringing estate claims that the debtor waives or refuses to bring. *See In re Hoffinger Indus., Inc.*, 321 B.R. 515 (Bankr. E.D. Ark. 2005) (look back avoids potential adverse consequences of a debtor's waiver); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 574 n.8 (3d Cir. 2003) (reservation in challenge rights protects Committee's interests).

**D.      Other Provisions in the Stipulation Are Contrary to the Bankruptcy Code or Not in the Best Interests of Creditors or the Estate.**

35.     *Postpetition Default Interest.* The Stipulation appears to give Ford Credit a claim for postpetition interest at the default rate until the Debtor's obligation to Ford Credit is paid in full.  *See* Stipulation ⁋ 4.h. To the extent that Ford Credit is undersecured, which it likely is, approving this stipulation would violate section 506(b) of the Bankruptcy Code, which provides that such interest is only allowed if the secured creditor is oversecured.

36.     *Automatic Committee Standing*.  The Stipulation provides that the Committee has Lien Challenge rights but does not provide automatic standing for the Committee to pursue such challenge on behalf of the Debtor's estate.  As this Court is aware, the time required to brief and argue a standing motion is significant.  In the interest of avoiding unnecessary delays and promoting the full investigation of liens and potential claims in the face of broad stipulations by the Debtor, this Court and other courts have also approved financing and cash collateral orders providing creditors' committees with automatic standing to commence an adversary proceeding

11

without the need to file a motion seeking standing to bring such an action.  Given the broad stipulations by the Debtor and the tight investigation period in this case, the Committee submits that it is appropriate to grant the Committee automatic standing to commence an adversary proceeding challenging the validity of Ford Credit's liens.

37.     *Default and Termination Provisions Should Be Amended*.   The Stipulation provides that an "Event of Default" occurs if the Debtor exceeds expenses in the budget, by line item or in the aggregate, by more than 10 percent. *See* Stipulation ℙ 13. This variance is far too restrictive given the nature of the Debtor's business and the risk that ordinary-course expenses might fluctuate significantly. Moreover, it is still unclear from the Debtor's 13-week budget what its cash needs exactly are and how the Debtor plans the finance this case. Therefore, the Committee requests that the Court modify the variance requirement to avoid placing undue risk on this Chapter 11 Case early on.

38.     *Reporting Requirements Must Include the Committee.* The Stipulation requires the Debtor to provide financial reporting information to Ford Credit but not the Committee. *See* Stipulation ℙ 4.o. Ford Credit should not be exclusively entitled to such information, especially because such information is critical to the discharge of the Committee's statutory responsibilities to oversee and investigate the Debtor's affairs. The Committee requests that the Court require the Debtor to provide all reporting required under paragraph 4.o of the Stipulation to the Committee.

39.     *The Provisions Governing Termination of the Automatic Stay Are Unreasonable*. The Stipulation provides Ford Credit with automatic stay relief without any meaningful opportunity for parties in interest to be heard. Specifically, the Stipulation states that the automatic stay is lifted two days after Ford Credit files a notice of default without any further

12

order from the Court. *See* Stipulation ⁋ 14. This provision unreasonably allows Ford Credit to obtain stay relief by unilaterally filing a notice of default. Should the Committee or any other party in interest contest the grounds of default, they would have no real way of preventing Ford Credit from taking its purported collateral. This provision is equally unreasonable because it presumably allows Ford Credit to take estate assets that it claims a lien on before the Committee is given the opportunity to challenge Ford Credit's lien or claim. For these reasons, the Committee requests that the Court should not afford Ford Credit with stay relief absent notice and a hearing.

## **RESERVATION OF RIGHTS**

40.     As of the date of the filing of this Objection, the Committee and its professionals are still performing diligence relevant to the proposed Cash Collateral Order and this Objection. The Budget continues to be updated as well.  Accordingly, this Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Objection, to raise additional objections and to introduce evidence at any hearing relating to this Objection, and without in any way limiting any other rights of the Committee to further object to the Motion, on any grounds, as may be appropriate

## **CONCLUSION**

WHEREFORE, the Committee requests that the Court deny entry of the Cash Collateral Order until the issues identified by the Committee are adequately resolved, and grant such other and further relief to which the Committee may be entitled.

Dated: June 9, 2026

Respectfully submitted,

**SUMMERS COMPTON WELLS LLC**

*/s/ David A. Sosne*
David A. Sosne (28365 MO)
903 South Lindbergh Blvd., Suite 200
St. Louis, MO 63131
Telephone: (314) 991-4999
Email: dsosne@scw.law

-and-

**FOLEY & LARDNER LLP**

Geoffrey S. Goodman (admitted *pro hac vice*)
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4514
Email: ggoodman@foley.com

-and-

Timothy C. Mohan (admitted *pro hac vice*)
1144 15th Street, Suite 2200
Denver, CO 80202
Telephone: (720) 437-2014
Email: tmohan@foley.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 15, 2026, the foregoing document was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

*/s/ David A. Sosne*
Proposed Counsel for the Official Committee
of Unsecured Creditors

14