**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re | | |
| BROADWAY FORD TRUCK SALES, INC. | ) | Case No. 26-42179<br>Chapter 11 |
| Debtor. | ) | |

**FORD MOTOR CREDIT COMPANY LLC'S OBJECTION TO DEBTOR'S FURTHER USE OF CASH COLLATERAL DUE TO DEBTOR'S BREACH OF THE TERMS OF THE STIPULATION AND INABILITY TO PROVIDE ADEQUATE PROTECTION**

Ford Motor Credit Company LLC (the "Ford Credit"), by and through its undersigned counsel, hereby files this objection (the "Objection"), along with the Declaration of Tom Evans in Support of the Objection ("Second Declaration") and Notice of Default ("Notice of Default"), objecting to the above-captioned debtor and debtor-in-possession's (the "Debtor") further use of cash collateral pursuant to sections 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code") as a result of Debtor's breach of the terms of the Stipulation for Interim Use of Cash Collateral [Doc. No. 3, Ex. A] ("Stipulation") approved by the Court ("First Interim Order" [Doc. No. 38] and "Second Interim Order" [Doc No. 77], and collectively, the "Interim Orders") upon the Debtor's Motion for Entry of Interim and Final Orders Authorizing (I) Debtor's Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code and the Terms of the Stipulation Between Debtor and Ford Motor Credit Company LLC, and (II) Setting Final Hearing for Use of Cash Collateral [Doc. No. 3] ("Motion"), resulting Events of Default under the Stipulation, and an inability to adequately protect Ford Credit for use of its Cash Collateral.

In support of its Objection, the Ford Credit respectfully states as follows:

1. On the first day of the above captioned Chapter 11 bankruptcy case ("Case"), Debtor filed its Motion seeking this Court's approval of the Stipulation. There is no other pending Motion whereby Debtor seeks this Court's approval to use Cash Collateral.

2. The terms and conditions of the Stipulation provided the framework for Debtor's use of Cash Collateral[1] upon the consent of Ford Credit, and now the Debtor has breached those terms. As a result, Ford Credit no longer consents to the use of Cash Collateral, and files its Notice of Default in connection herewith.

3. Although the Stipulation, as approved by the Court pursuant to the Interim Orders, provides for automatic relief from the automatic stay and surrender of the Ford Credit Collateral to Ford Credit without the need for further order of the Court, Ford Credit files this Objection to place before the Court the facts that gave rise to the Event of Default and Default Notice, and to demonstrate to the Court that the Debtor in unable to adequately protect Ford Credit and absent Ford Credit's consent, the Debtor does not have the ability to use Cash Collateral.

## THE AGREEMENTS BETWEEN FORD CREDIT AND THE DEBTOR

4. Ford Credit provided wholesale floor plan financing to Debtor pursuant to the following agreements and all other documents executed in connection therewith (collectively, the "**Ford Credit Loan Documents**"):

(a) Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement by Debtor in favor of Ford

---

1 Capitalized terms not expressly defined herein have the meaning ascribed to them in the Stipulation, or the Second Declaration.

Credit dated December 18, 1997 pursuant to which Ford Credit agrees to establish and maintain for Debtor, a wholesale line of credit to finance new, used and demonstrator motor vehicles, and other vehicles, equipment, inventory and goods pursuant to the terms and conditions set forth therein ("**Wholesale Agreement**");

(b) Security Agreement by Debtor in favor of Ford Credit dated November 15, 2011 ("**Security Agreement**") pursuant to which Debtor grants Ford Credit a security interest in all of the following assets of Debtor now owned or hereafter acquired and all products and proceeds thereof: equipment, furniture, fixtures, motor vehicles, accounts, instruments, chattel paper, general intangibles, contract rights, documents, service parts, goods and inventory (collectively, the "**Ford Credit Collateral**"). Ford Credit's security interest in the Ford Credit Collateral was (and remains) perfected by the filing of a UCC-1 financing statement with the Delaware Secretary of State on March 14, 2002 at number 20020873806 as amended and continued from time to time; and

(c) All other documents executed in connection therewith.

**THE DEBTOR'S MULTIPLE DEFAULTS**

5. Ford Credit conducted a routine 2-day physical audit of the Debtor's vehicle inventory on or about April 7 and 8, 2026.

6. During that audit, Ford Credit identified 26 violations for vehicles that the Debtor had sold but had not paid for within the permitted days for it to do so pursuant to the Ford Credit Loan Documents.

7. As a result, the Debtor owed to Ford Credit, and Ford Credit demanded that the Debtor immediately pay $1.5 million.

8. The Debtor initiated an electronic funds transfer ("**DEFT**") to Ford Credit for that amount, but that DEFT was returned due to insufficient funds.

9. The Debtor subsequently claimed that its bank had a daily wire limit of $1 million and made arrangements to pay the $1.5 million that was due over the course of the next week.

10. As part of Ford Credit's containment in response to the default, and to permit the Debtor to continue to operate ("**Containment**"): (i) Ford Credit took possession of all keys, title and MSO's to all Vehicles, (ii) keys were released to a representative designated by the Debtor and approved by Ford Credit to allow for test drives of the vehicles, after which the keys were immediately returned to the Ford Credit representative; and (iii) keys and the MSO or certificate of title to a vehicle which was sold were released to a representative designated by the Debtor upon (1) proof that a contract of sale was signed by the buyer and seller, (2) proof that the amount of funds payable as a result of the sale were acceptable to Ford Credit, and (3) presentment of a certified check payable to Ford Credit being delivered to the Ford Credit representative in the sale price.

11. In the meantime, Ford Credit scheduled an emergency, 2-day physical audit of the Debtor's inventory on or about April 15 and 16, 2026.

12. As a result of that emergency audit, Ford Credit identified additional violations for vehicles that the Debtor had sold, but had not paid for within the permitted days for it to do so.

13. As a result, the Debtor owed to Ford Credit, and Ford Credit demanded that it immediately pay an additional $1.4 million.

14. The Debtor was unable to pay that amount and, as a result, Ford Credit declared a default under its agreements with the Debtor.

15. Ford Credit subsequently discovered that the Debtor also had failed to pay for numerous vehicles that it had sold to customers pursuant to Assignments of Proceeds – despite the Debtor having received payments from those customers (a portion of which should have been remitted to Ford Credit upon receipt) (the "AOP Sales").

16. Specifically, Ford Credit had previously permitted the Debtor to sell commercial vehicles to certain customers (primarily municipal entities such as police or fire departments) with the understanding that the Debtor would make payment for those vehicles to Ford Credit after those vehicles were upfit with additional equipment required by the end users and those end users had actually paid the Debtor for the upfitted vehicles.

17. In numerous instances, however, the Debtor received payments for those AOP Sales and failed to remit amounts due to Ford Credit as a result.

18. As a result of the AOP Sales, the Debtor owed Ford Credit a further $2 million (in addition to the $1.4 million that it already owed to Ford Credit because of the emergency audit).

19. Ford Credit demanded that the Debtor immediately pay the amounts due for the AOP Sales, but the Debtor failed to do so.

20. Further investigation revealed still further units that the Debtor had sold without paying amounts due to Ford Credit as and when those amounts were due to Ford Credit.

21. Failing to pay off amounts financed for floor-planned vehicles is an event of default under the Debtor's Wholesale Agreement and is commonly referred to as being "out of trust." A sale which is made "out of trust" is referred to as a "sale out of trust" or "SOT."

22. Attached as Exhibit D to the first Tom Evans Declaration Consenting to the Use of Cash Collateral Only to the Extent of the Terms Set Forth in the Stipulation for Use of Cash Collateral Due to Debtor's Inability to Provide Adequate Protection [Doc. No. 25] ("First Declaration") is a schedule of all Ford Credit financed Vehicles which were SOT as of April 28, 2026, which resulted in a $4,640,169.39 loss of collateral to Ford Credit.

23. Since the middle of April, 2026 almost daily audits have been taking place, and Ford Credit has amended its list of SOT vehicles to reflect total SOT loss of collateral of approximately $4,803,000.

24. Attached as Exhibit A is the list of SOT Vehicles as of June 11, 2026.

25. As a result of the SOT and payment default, Ford Credit accelerated and demanded payment of all amounts due to it from the Debtor by letter dated April 26, 2026.

26. Since the middle of April, 2026, Ford Credit implemented the Containment procedures.

## THE COMMENCEMENT OF A CHAPTER 11 BANKRUPTCY

27. On May 18, 2026 ("**Petition Date**"), Debtor filed a bankruptcy petition pursuant to Chapter 11 of Title 11 of the United States Code, and filed the subject Motion.

## THE FORD CREDIT INDEBTEDNESS

28. As of April 24, 20206, Debtor owed Ford Credit not less than $33,675,691.06 pursuant to the Ford Credit Loan Documents as more specifically set forth in the First Declaration.

29. As of June 11, 2026, Debtor owes Ford Credit not less than $29,536,744.93 as follows ("**Ford Credit Indebtedness**"):

| | |
|---|---|
| Total Principal Floorplan Wholesale Outstanding as of 6/11/26 | $28,032,398.06 |
| Wholesale Charges Outstanding as of 6/1/26 | $786,491.65 |
| TRAC Lease Accounts Outstanding as of 6/11/26 | $569,137.47 |
| Invoiced Onsite Representative Fees as of 6/11/26 | $69,726.25 |
| Known Legal Fees as of 5/28/26 | $78,991.50 |
| **Total Indebtedness ** plus additional costs, expenses, attorneys fees and all other amounts due and owing under the Ford Credit Loan Documents as of the Petition Date and all additional interest and expenses accruing thereafter** | **$29,536,744.93** |

30. The Ford Credit Indebtedness is secured by a first-priority, properly perfected security interest and/or lien on the Ford Credit Collateral as provided for in the Ford Credit Loan Documents, including, without limitation, the Cash Collateral.

## DEBTOR'S LACK OF EQUITY IN ITS ASSETS

31. Ford Credit has extensive experience liquidating vehicle inventory and other assets from distressed dealerships, and Ford Credit's processes and procedures for liquidating its vehicle collateral include a standard and reliable process for determining the anticipated liquidation value of such collateral.

32. Specifically, Ford Credit's valuation processes and procedures anticipate – on average – a five percent loss on all current model year vehicles, a twenty percent loss on all prior model year vehicles, and a thirty percent loss on all used vehicles.

33. Utilizing the foregoing benchmarks, Ford Credit estimated that as of April 21, 2026, and as more specifically set forth in the First Declaration, the value of the floor planned Vehicles was no more than $24,412,000 (rounded to the nearest $1,000).

34. As of June 11, 2026 Ford Credit estimates that the value of the floor planned ("Floored Vehicle Collateral") is no more than $19,524,000 (rounded to the nearest $1,000) as follows:

| Financed Vehicle Type | Number of Units | Value | Sold out of Trust | Remaining Vehicles | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|---|---|---|
| New Current | 144 | $9,025,000.00 | $195,000.00 | $8,830,000.00 | $442,000.00 | $8,388,000.00 |
| New Prior Year | 97 | $9,068,000.00 | $1,458,000.00 | $7,610,000.00 | $1,523,000.00 | $6,087,000.00 |
| Units with Modifications | 47 | $4,980,000.00 | $0.00 | $4,980,000.00 | $1,245,000.00 | $3,735,000.00 |
| In-Transit | 2 | $141,000.00 | $0.00 | $141,000.00 | $0.00 | $141,000.00 |
| Demo Current | 1 | $58,000.00 | $0.00 | $58,000.00 | $12,000.00 | $46,000.00 |
| Demo Prior Year | 7 | $489,000.00 | $0.00 | $489,000.00 | $147,000.00 | $342,000.00 |
| P-Cars | 14 | $599,000.00 | $0.00 | $599,000.00 | $180,000.00 | $419,000.00 |
| Used | 13 | $523,000.00 | $0.00 | $523,000.00 | $157,000.00 | $366,000.00 |
| DPP | 57 | $3,150,000.00 | $3,150,000.00 | $0.00 | $0.00 | $0.00 |
| **Total Financed Vehicles** | **382** | **$28,033,000.00** | **$4,803,000.00** | **$23,230,000.00** | **$3,706,000.00** | **$19,524,000.00** |

35. The Ford Credit Collateral also includes non-floored used Vehicles valued at approximately $622,345 utilizing rough NADA valuation, and eleven TRAC lease vehicles valued $286,800, as of June 11, 2026.

36. Based on the foregoing, Ford Credit values Ford Credit's total Vehicle Ford Credit Collateral at no more than $20,433,145.

37. Ford Credit also has extensive experience liquidating non-vehicle assets of distressed dealerships, and Ford Credit's processes and procedures for liquidating its non-vehicle collateral include a standard and reliable process for determining the anticipated liquidation value of such collateral as follows:

(a) 55 percent of parts and accessories,

(b) 45 percent of equipment and fixtures,

(c) 75 percent of factory receivables, and

(d) generally, 60 percent of accounts receivable.

38. Based on the foregoing, Ford Credit estimated that Debtor's non-vehicle Ford Credit Collateral was worth, at most, $2,276,000.00 as of April 28, 2026.

39. Utilizing the Debtor's most recent dealer Financial Statement, Ford Credit estimates that as of June 11, 2026, Debtor's non-vehicle Ford Credit Collateral is worth, at most, $2,253,241 as follows[2]:

**Non-Vehicle Collateral Value Based Upon April 30, 2026 Dealer Financial Statement**

| | DFS Reported Value | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|
| Parts and Accessories | $1,670,360.00 | $751,662.00 | $918,698.00 |
| Equipment and Fixtures | $1,557,623.00 | $856,692.65 | $700,930.35 |
| Notes and Accounts Receivable | $678,203.00 | $271,281.20 | $406,921.80 |
| Factory Receivables | $302,255.00 | $75,563.75 | $226,691.25 |
| | | | **$2,253,241.40** |

[2] Utilizing the Debtor's Schedules, the value of the non-vehicle Ford Credit Collateral could be as low as $226,691.25.

40. As such, as of June 11, 2026, Ford Credit calculates that the total value of the Ford Credit Collateral to be ***approximately*** $22,686,386 plus goodwill/blue sky, as more specifically set forth below:

| Financed Vehicle Type | Number of Units | Value | Sold out of Trust | Remaining Vehicles | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|---|---|---|
| New Current | 144 | $9,025,000.00 | $195,000.00 | $8,830,000.00 | $442,000.00 | $8,388,000.00 |
| New Prior Year | 97 | $9,068,000.00 | $1,458,000.00 | $7,610,000.00 | $1,523,000.00 | $6,087,000.00 |
| Units with Modifications | 47 | $4,980,000.00 | $0.00 | $4,980,000.00 | $1,245,000.00 | $3,735,000.00 |
| In-Transit | 2 | $141,000.00 | $0.00 | $141,000.00 | $0.00 | $141,000.00 |
| Demo Current | 1 | $58,000.00 | $0.00 | $58,000.00 | $12,000.00 | $46,000.00 |
| Demo Prior Year | 7 | $489,000.00 | $0.00 | $489,000.00 | $147,000.00 | $342,000.00 |
| P-Cars | 14 | $599,000.00 | $0.00 | $599,000.00 | $180,000.00 | $419,000.00 |
| Used | 13 | $523,000.00 | $0.00 | $523,000.00 | $157,000.00 | $366,000.00 |
| DPP | 57 | $3,150,000.00 | $3,150,000.00 | $0.00 | $0.00 | $0.00 |
| **Total Financed Vehicles** | **382** | **$28,033,000.00** | **$4,803,000.00** | **$23,230,000.00** | **$3,706,000.00** | **$19,524,000.00** |

**All values rounded to the nearest $1,000.00**

| | |
|---|---|
| **TRAC Vehicle Values** | **$286,800.00** |
| **Non-Floored Vehicles** | **$622,345.00** |

**Non-Vehicle Collateral Value Based Upon April 30, 2026 Dealer Financial Statement**

| | DFS Reported Value | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|
| **Parts and Accessories** | $1,670,360.00 | $751,662.00 | $918,698.00 |
| **Equipment and Fixtures** | $1,557,623.00 | $856,692.65 | $700,930.35 |
| **Notes and Accounts Receivable** | $678,203.00 | $271,281.20 | $406,921.80 |
| **Factory Receivables** | $302,255.00 | $75,563.75 | $226,691.25 |
| | | | **$2,253,241.40** |

| | |
|---|---|
| **Total Collateral Valuation** | **$22,686,386.40** |

41. Therefore, the value of all of the remaining Ford Credit Collateral is approximately $6,850,358.53 ***less*** than the Ford Credit Indebtedness, as compared to an approximately $5,910,000 shortfall as of April 24, 2026, which calculates to an on average diminution of Ford Credit Collateral of $19,623.19 ***per day***, as follows:

| | Collateral Shortfall | Per Diem Diminution |
|---|---|---|
| Collateral Shortfall as of April 24, 2026 | ($5,908,445.48) | |
| Collateral Shortfall as of June 11, 2026 | ($6,850,358.53) | |
| | | |
| Diminution of Ford Credit Collateral from April 24 to June 11, 2026 | ($941,913.05) | ($19,623.19) |
| Additional Diminution if Sale Closes by July 23, 2026 (6 wk sale process) | ($824,173.98) | |
| Further Diminution Due to Lack of Binding LOIs and 30 day diligence | ($588,695.70) | |
| | ($2,354,782.73) | |

42. Ford Credit willingly consented to the use of Cash Collateral in hopes of decreasing its collateral shortfall in a sale process. and drafted adequate protection provisions into the Stipulation to enable it to safeguard against diminution in the Ford Credit Collateral by setting an expedited sale process and inserting objection rights to an LOI to protect it from being economically harmed by a sale process.

43. As a result of the Debtor's breach of the terms of the Stipulation and resulting Events of Default thereunder, Ford Credit no longer consents to the use of Cash Collateral.

44. As more specifically set forth in the table immediately above, Ford Credit is incurring an on average $19,623.19 ***per day*** diminution in the value of its collateral relative to the Ford Credit Indebtedness, comparing the amount of its indebtedness and value of its collateral from April 24, 2026 to June 11, 2026.

45. In other words, the collateral shortfall is growing by $19,623.19 ***per day***, and every day that this dealership continues to operate using Ford Credit's cash collateral or waiting for a sale to close, widens the gap.

46. The Debtor's failure to secure a binding LOI for the sale of its assets by June 12, 2026 would necessarily result in a longer sale process and growing deficiency for Ford Credit.

47. Ford Credit consented to the use of Cash Collateral in hopes of decreasing its collateral shortfall in a sale process and drafted the adequate protection provisions into the Stipulation to enable it to safeguard against diminution in the Ford Credit Collateral. Failure of the Debtor to secure a binding LOI by June 12, 2026, failure to deliver an LOI acceptable to Ford Credit, and failure to deliver a Budget with a committed plan for the capital, equity or financing infusion necessary to keep the Debtor operating through a sale process, requires that Ford Credit call the Notice of Default and terminate the Debtor's use of Cash Collateral.

**<u>THE DEBTOR'S BREACH OF THE STIPULATION</u>**

48. As of the date hereof, the following Events of Default have occurred under the Stipulation:

a. The Debtor failed to timely provide Ford Credit a completed schedule of Offsite Vehicles, as required by Paragraph 4.k of the Stipulation[3];

b. The Debtor has failed to provide to Ford Credit copies of applicable customer contracts for Customer Contracted Vehicles and information regarding deposits paid by customers in connection with Customer Contracted Vehicles, as required by Paragraph 4.k of the Stipulation;

c. The Debtor has made minimal attempts to date to recover the remaining approximately 100 Offsite Vehicles valued at no less than $9M, which Offsite Vehicles are required to be returned to the dealership or such other location acceptable to Ford Credit by June 11, 2026, pursuant to Paragraph 5 of the Cash Collateral Order.

---

[3] Ford Credit acknowledges that it was provided an incomplete marked up list of "Offsite Vehicles" from Debtor's counsel on June 9, 2026 at 1:31pm. To date the debtor has no action plan in place to secure return of the Offsite Vehicles.

d. The Debtor has failed to timely provide certain financial reporting to Ford Credit, including weekly variance reporting required by Paragraph 4.o(i) of the Stipulation, proof of payoff of balances due on all Trade-In vehicles required by Paragraph 4.o(v) of the Stipulation, and proof of payment of post-petition sales tax, as required by Paragraph 4.o(vi) of the Stipulation.

e. The Debtor failed to obtain and file with the Court an asset purchase agreement or binding letter of intent ("LOI")[4] for the sale of the Debtor's dealership and assets in form and content reasonably acceptable to Ford Credit.

f. As of the date hereof, the Debtor and Ford Credit have failed to agree to the terms of a Budget reasonably acceptable to Ford Credit prior to the expiration of the Interim Period on June 17, 2026, pursuant to Paragraph 13 of the Stipulation.[5]

## OBJECTION

1. Ford Credit has been supportive of maximizing the value of the Debtor' assets, and generating an outcome that is consistent with continuing the dealership as a going concern under new ownership.

2. Nevertheless, there remains no definitive path forward for accomplishing this outcome, and Ford Credit's collateral shortfall is growing at a rate of at least $18,000 ***per day***.

---

[4] Ford Credit acknowledges receiving: (a) (4) non-binding letters, spreadsheets, and/or indications of interest from parties interested in purchasing anywhere between three and forty-six vehicles from the Debtor with offer prices between 49-68% of the retail sale price required pursuant to the terms of the Stipulation; and (b) (1) non-binding letter of intent from a party interested in purchasing a slightly less than 50% of the Debtor's vehicle inventory, a portion of the parts, and offering $250,000 for the goodwill/franchise value of dealership ("Non-Complying Offers").

[5] Ford Credit acknowledges that the on June 13, 2026, the Debtor provided Ford Credit a proposed thirteen week Budget, which Budget does not maintain positive cash flow and requires the infusion of no less than $702,000 in debtor in possession financing, capital infusion, equity infusion, or prepetition claim repayment (which is Ford Credit collateral); and the Debtor admittedly has no committed source of the needed $575,000. In addition, the Budget does not include any amount for professional fees for proposed counsel to the Committee of Unsecured Creditors.

3. In addition, there is no pending motion for use of Cash Collateral other than on consent pursuant to the Stipulation.

4. Moreover, there is no equity cushion in the Ford Credit Collateral (as set forth in the Second Declaration), Debtor has no other assets to pledge to Ford Credit (pursuant to the Debtor's filed Schedules and Statements of Financial Affairs [Doc. No. 93 "Schedules"), and upon information and belief Debtor currently has no committed source of capital or equity infusion to adequately protect Ford Credit.

5. Consequently, use of Cash Collateral other than on Ford Credit consent, would be denied.

**ARGUMENT**

6. Section 363 of the Bankruptcy Code provides that a trustee or debtor in possession may not utilize cash collateral unless the creditor holding an interest in such cash collateral absolutely consents or, after notice and a hearing, the court finds that the secured creditor's interest in the cash collateral is adequately protected. 11 U.S.C. § 363(c)(2) and (e); *see also In re Kielhafner*, 69 B.R. 51 (Bankr. E.D. Mo. 1986).

7. Given Ford Credit's clear interest in the Cash Collateral, the burden is on the Debtor to establish that Ford Credit's interest in the Cash Collateral is adequately protected. *See* 11 U.S.C. § 363(p)(1); *In re Raymer*, 2021 WL 510198 (D. Neb. 2021);.

8. Adequate protection must protect the creditor's interest from any diminution in value while in use by a trustee or debtor in possession. *Id.*, citing, *In re Gess*, 526 B.R. 798, 801 (B.A.P. 8th Cir. 2015) (vehicles depreciate rather quickly). Thus, the extent of adequate protection a debtor should be required to provide is determined by the expected

decrease in value of the secured creditor's collateral. *Id*, citing, *In re Swedeland*, 16 F. 3d 552, 564 (3d Cir. 1994).

9. Section 361 of the Bankruptcy Code sets forth three non-exclusive examples of what may constitute adequate protection: (i) cash payments equivalent to the decrease in value of the security interest; (ii) an additional or replacement lien on other property; and/or (iii) other relief that provides the "indubitable equivalent" in value of the security interest. 11 U.S.C. § 361; *In re Swedeland*, 16 F. 3d at 564.

10. Although section 361 of the Bankruptcy Code does not set forth an exhaustive list of what constitutes adequate protection, it does provide the most commonly accepted forms of adequate protection.

11. Importantly, any adequate protection must not be illusory or speculative in value, and, particularly in the context of the use of cash collateral, must be "of the most indubitable equivalence." Uncertain future sales are not adequate protection. *In re Martin*, 761 F.2d 472, 477 (8th Cir. 1985).

12. Here, there is no question that Ford Credit is ***not*** (and cannot be) adequately protected.

13. As set forth above, every day operating erodes Ford Credit's interest in the Cash Collateral and the longer the Debtor is allowed to continue to operate the larger that deficit will be, with no definitive offer to purchase the Debtor's assets, and insufficient cash to operate without some form of post-petition infusion of cash that has yet to be secured.

14. Ford Credit reserves its right to supplement this Objections to the extent Debtor responds or further motions for the use of Cash Collateral.

WHEREFORE, the Ford Credit respectfully requests that this Court uphold the Interim Orders and terms of the Stipulation which self-effectuate Termination of the use of Cash Collateral and result in the voluntary surrender of the Ford Credit Collateral to Ford Credit as set forth herein and grant such other relief as is necessary and proper.

SPENCER FANE LLP

By: /s/ Ryan C. Hardy

Ryan C. Hardy, MO62926
Spencer Fane LLP
1 North State Street, Suite 1500
Chicago, IL 60602
Phone: (314) 746-0047
E-mail: rhardy@spencerfane.com

and

Eric C. Peterson, MO62429
Spencer Fane LLP
1 North Brentwood Blvd, Ste 1200
St. Louis, Missouri 63105
Phone: (314) 863-7733
E-mail: epeterson@spencerfane.com

and

PHILLIPS LYTLE LLP
Angela Z. Miller Esq. (pro hac)
Craig Leslie, Esq. (pro hac pending)
Phillips Lytle LLP
125 Main Street
Buffalo, NY 14203
Phone: (716) 847-7060
Fax: (716) 852-6100
E-mail: amiller@phillipslytle.com

*Attorneys for Ford Motor Credit Company LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 15th day of June 2026, a true and correct copy of the foregoing was served on all counsel of record via the Court's ECF system, with notice of case activity generated.

____/s/ Ryan C. Hardy________________
*Counsel for Ford Motor Credit Company LLC*