**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re | | |
| BROADWAY FORD TRUCK SALES, INC. | ) | Case No. 26-42179 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF TOM EVANS IN SUPPORT OF FORD MOTOR CREDIT COMPANY LLC'S OBJECTION TO DEBTOR'S FURTHER USE OF CASH COLLATERAL DUE TO DEBTOR'S BREACH OF THE TERMS OF THE STIPULATION AND INABILITY TO PROVIDE ADEQUATE PROTECTION**

I, Tom Evans, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am over twenty-one (21) years of age. I have personal knowledge of, and I am competent to testify to the matters set forth in this Declaration.

2. I am now, and have been at all relevant times, a Regional Manager for Ford Motor Credit Company LLC ("Ford Credit") and in that capacity and upon review of Ford Credit's books and records concerning Broadway Ford Truck Sales, Inc. ("Debtor" or Broadway") make the statements herein.

3. Reference is made to my First Declaration Consenting to the Use of Cash Collateral Only to the Extent of the Terms Set Forth in the Stipulation for Use of Cash Collateral Due to Debtor's Inability to Provide Adequate Protection [Doc. No. 25] ("First Declaration"), which was filed in support of Debtor's Motion for Entry of Interim and Final Orders Authorizing (I) Debtor's Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code and the Terms of the Stipulation Between Debtor and Ford Motor Credit Company LLC, and (II) Setting Final Hearing for Use of Cash Collateral [Doc. No. 3] ("Motion") and

the Stipulation for Interim Use of Cash Collateral [Doc. No. 3, Ex. A] ("Stipulation") filed in connection with.

4. My First Declaration set forth the facts supporting Ford Credit's position that the Debtor cannot adequately protect Ford Credit. There is no equity cushion in the Ford Credit Collateral (as set forth herein), Debtor has no other assets to pledge to Ford Credit (pursuant to the Debtor's filed Schedules and Statements of Financial Affairs [Doc. No. 93] ("Schedules")), and upon information and belief Debtor currently has no committed source of capital or equity infusion to adequately protect Ford Credit.

5. The terms and conditions of the Stipulation provided the framework for Debtor's consensual use of cash collateral, and now the Debtor has breached those terms. As a result, Ford Credit no longer consents to the use of Cash Collateral, and has filed its Notice of Default on the docket of the above-captioned case ("Case") [Doc. No. 101].

6. Although the Stipulation, approved by the Court on two occasions, ("First Interim Order" [Doc. No. 38] and "Second Interim Order [Doc No. 77] (collectively, the "Interim Orders")), provides for automatic relief from the automatic stay and surrender of the Ford Credit Collateral to Ford Credit, without the need for further order of the Court, this Declaration is filed to place before the Court the facts that gave rise to the Event of Default and Default Notice, and to demonstrate to the Court that the Debtor in unable to adequately protect Ford Credit and – absent Ford Credit's consent, that the Debtor does not have the ability to use Cash Collateral.

7. Based on my knowledge, I believe that each of the facts recited in the herein are true and correct.

## THE AGREEMENTS BETWEEN FORD CREDIT AND THE DEBTOR

8. Ford Credit provided wholesale floor plan financing to Debtor pursuant to the following agreements and all other documents executed in connection therewith (collectively, the "**Ford Credit Loan Documents**"):

(a) Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement by Debtor in favor of Ford Credit dated December 18, 1997 pursuant to which Ford Credit agrees to establish and maintain for Debtor, a wholesale line of credit to finance new, used and demonstrator motor vehicles, and other vehicles, equipment, inventory and goods pursuant to the terms and conditions set forth therein ("**Wholesale Agreement**") a copy of which is attached as Exhibit G;

(b) Security Agreement by Debtor in favor of Ford Credit dated November 15, 2011 ("**Security Agreement**") a copy of which is attached as Exhibit H, pursuant to which Debtor grants Ford Credit a security interest in all of the following assets of Debtor now owned or hereafter acquired and all products and proceeds thereof: equipment, furniture, fixtures, motor vehicles, accounts, instruments, chattel paper, general intangibles, contract rights, documents, service parts, goods and inventory (collectively, the "**Ford Credit Collateral**"). Ford Credit's security interest in the Ford Credit Collateral was (and remains) perfected by the filing of a UCC-1 financing statement with the

Delaware Secretary of State on March 14, 2002 at number 20020873806 as amended and continued from time to time, a copy of which is attached as Exhibit I; and

(c) All other documents executed in connection therewith.

**<u>THE DEBTOR'S MULTIPLE DEFAULTS</u>**

9. Ford Credit conducted a routine 2-day physical audit of the Debtor's vehicle inventory on or about April 7 and 8, 2026.

10. During that audit, Ford Credit identified 26 violations for vehicles that the Debtor had sold – but had not paid for within the permitted days for it to do so, pursuant to the Ford Credit Loan Documents.

11. As a result, the Debtor owed to Ford Credit, and Ford Credit demanded that the Debtor immediately pay $1.5 million.

12. The Debtor initiated an electronic funds transfer ("DEFT") to Ford Credit for that amount, but that DEFT was returned due to insufficient funds.

13. The Debtor subsequently claimed that its bank had a daily wire limit of $1 million, and made arrangements to pay the $1.5 million that was due over the course of the next week.

14. As part of Ford Credit's containment in response to the default, and to permit the Debtor to continue to operate ("Containment"): (i) Ford Credit took possession of all keys, title and MSO's to all Vehicles, (ii) keys were released to a representative designated by the Debtor and approved by Ford Credit to allow for test drives of the vehicles, after which the keys were immediately returned to the Ford Credit representative; and (iii) keys and the MSO or certificate of title to a vehicle which was sold were released to

a representative designated by the Debtor upon (1) proof that a contract of sale was signed by the buyer and seller, (2) proof that the amount of funds payable as a result of the sale were acceptable to Ford Credit, and (3) presentment of a certified check payable to Ford Credit being delivered to the Ford Credit representative in the sale price.

15. In the meantime, Ford Credit scheduled an emergency, 2-day physical audit of the Debtor's inventory on or about April 15 and 16, 2026.

16. As a result of that emergency audit, Ford Credit identified additional violations for vehicles that the Debtor had sold but had not paid for within the permitted days for it to do so.

17. As a result, the Debtor owed to Ford Credit, and Ford Credit demanded that it immediately pay an additional $1.4 million.

18. The Debtor was unable to pay that amount and, as a result, Ford Credit declared a default under its agreements with the Debtor.

19. Ford Credit subsequently discovered that the Debtor also had failed to pay for numerous vehicles that it had sold to customers pursuant to Assignments of Proceeds – despite the Debtor having received payments from those customers (a portion of which should have been remitted to Ford Credit upon receipt) (the "AOP Sales").

20. Specifically, Ford Credit had previously permitted the Debtor to sell commercial vehicles to certain customers (primarily municipal entities such as police or fire departments) with the understanding that the Debtor would make payment for those vehicles to Ford Credit after those vehicles were upfit with additional equipment required by the end users and those end users had actually paid the Debtor for the upfitted vehicles.

21. In numerous instances, however, the Debtor received payments for those AOP Sales and failed to remit amounts due to Ford Credit as a result.

22. As a result of the AOP Sales, the Debtor owed Ford Credit a further $2 million (in addition to the $1.4 million that it already owed to Ford Credit because of the emergency audit).

23. Ford Credit demanded that the Debtor immediately pay the amounts due for the AOP Sales, but the Debtor failed to do so.

24. Further investigation revealed still further units that the Debtor had sold without paying amounts due to Ford Credit as and when those amounts were due to Ford Credit.

25. Failing to pay off amounts financed for floor-planned vehicles is an event of default under the Debtor's Wholesale Agreement and is commonly referred to as being "out of trust." A sale which is made "out of trust" is referred to as a "sale out of trust" or "SOT."

26. Attached as Exhibit D to my First Declaration is a schedule of all Ford Credit financed Vehicles which were SOT as of April 28, 2026, which resulted in a $4,640,169.39 loss of collateral to Ford Credit.

27. Since the middle of April, 2026, almost daily audits have been taking place, and Ford Credit has amended its list of SOT vehicles to reflect total SOT loss of collateral of approximately $4,803,000 (an increase of almost $200,000). Attached as Exhibit A is the list of SOT Vehicles as of June 11, 2026.

28. As a result of the SOT and payment default, Ford Credit accelerated and demanded payment of all amounts due to it from the Debtor by letter dated April 26, 2026.

29. Since the middle of April, 2026, Ford Credit implemented containment procedures similar to those set forth in Paragraph 4.c. of the Stipulation.

## THE COMMENCEMENT OF A CHAPTER 11 BANKRUPTCY

30. It is my understanding that on May 18, 2026 ("**Petition Date**"), Debtor filed a bankruptcy petition pursuant to Chapter 11 of Title 11 of the United States Code.

## THE FORD CREDIT INDEBTEDNESS

31. As of April 24, 20206, Debtor owed Ford Credit not less than $33,675,691.06 pursuant to the Ford Credit Loan Documents, as more specifically set forth in my First Declaration. First Declaration, ¶ 30.

32. As of June 11, 2026, Debtor owes Ford Credit not less than $29,536,744.93 as follows ("**Ford Credit Indebtedness**"):

| | |
|---|---|
| Total Principal Floorplan Wholesale Outstanding as of 6/11/26 | $28,032,398.06 |
| Wholesale Charges Outstanding as of 6/1/26 | $786,491.65 |
| TRAC Lease Accounts Outstanding as of 6/11/26 | $569,137.47 |
| Invoiced Onsite Representative Fees as of 6/11/26 | $69,726.25 |
| Known Legal Fees as of 5/28/26 | $78,991.50 |
| **Total Indebtedness ** plus additional costs, expenses, attorneys fees and all other amounts due and owing under the Ford Credit Loan Documents as of the Petition Date and all additional interest and expenses accruing thereafter** | **$29,536,744.93** |

33. Attached as Exhibit B is Broadway's Daily Statement evidencing the principal balance as of June 11, 2026.

34. Attached as Exhibit C is the June 1, 2026 Wholesale Statement evidencing the wholesale charges due as of June 1, 2026.

35. Attached as Exhibit D is a schedule of indebtedness due on the TRAC leases as of June 11, 2026.

36. Copies of invoices for costs incurred by Ford Credit to retain onsite Ford Credit Representatives, and redacted summaries of invoices for legal fees can be provided upon request.

37. The Ford Credit Indebtedness is secured by a first-priority, properly perfected security interest and/or lien on the Ford Credit Collateral, as provided for in the Ford Credit Loan Documents, including, without limitation, the Cash Collateral.

**DEBTOR'S LACK OF EQUITY IN ITS ASSETS**

38. As stated in my First Declaration, and worth repeating here, Ford Credit has extensive experience liquidating vehicle inventory and other assets from distressed dealerships, and Ford Credit's processes and procedures for liquidating its vehicle collateral include a standard and reliable process for determining the anticipated liquidation value of such collateral.

39. Specifically, Ford Credit's valuation processes and procedures anticipate – on average – a five percent loss on all current model year vehicles, a twenty percent loss on all prior model year vehicles, and a thirty percent loss on all used vehicles.

40. Utilizing the foregoing benchmarks, Ford Credit estimated that, as of April 21, 2026 and as more specifically set forth in my First Declaration, the value of the floor planned Vehicles was no more than $24,412,000 (rounded to the nearest $1,000). First Declaration, ¶ 34.

41. As of June 11, 2026 Ford Credit estimates that the value of the floor planned ("Floored Vehicle Collateral") is now no more than $19,524,000 (rounded to the nearest $1,000), as follows:

| Financed Vehicle Type | Number of Units | Value | Sold out of Trust | Remaining Vehicles | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|---|---|---|
| New Current | 144 | $9,025,000.00 | $195,000.00 | $8,830,000.00 | $442,000.00 | $8,388,000.00 |
| New Prior Year | 97 | $9,068,000.00 | $1,458,000.00 | $7,610,000.00 | $1,523,000.00 | $6,087,000.00 |
| Units with Modifications | 47 | $4,980,000.00 | $0.00 | $4,980,000.00 | $1,245,000.00 | $3,735,000.00 |
| In-Transit | 2 | $141,000.00 | $0.00 | $141,000.00 | $0.00 | $141,000.00 |
| Demo Current | 1 | $58,000.00 | $0.00 | $58,000.00 | $12,000.00 | $46,000.00 |
| Demo Prior Year | 7 | $489,000.00 | $0.00 | $489,000.00 | $147,000.00 | $342,000.00 |
| P-Cars | 14 | $599,000.00 | $0.00 | $599,000.00 | $180,000.00 | $419,000.00 |
| Used | 13 | $523,000.00 | $0.00 | $523,000.00 | $157,000.00 | $366,000.00 |
| DPP | 57 | $3,150,000.00 | $3,150,000.00 | $0.00 | $0.00 | $0.00 |
| **Total Financed Vehicles** | **382** | **$28,033,000.00** | **$4,803,000.00** | **$23,230,000.00** | **$3,706,000.00** | **$19,524,000.00** |

42. Accordingly, the value of the remaining Floored Vehicle Collateral has declined by almost $5,000,000 versus Ford Credit's initial estimates.

43. The Ford Credit Collateral also includes non-floored used Vehicles valued at approximately $622,345 utilizing rough NADA valuation, and eleven TRAC lease vehicles valued $286,800, as of June 11, 2026. A schedule of the non-floored used Vehicles is attached as Exhibit E. A list of the TRAC vehicles is set forth on Exhibit D.

44. Based on the foregoing, Ford Credit values Ford Credit's total Vehicle Ford Credit Collateral at no more than $20,433,145.

45. Attached as Exhibit F is Broadway's April 2026 Financial Statement (most current available dealer Financial Statement), which was provided to Ford Credit by Broadway as required by the Ford Credit Loan Documents. Broadway's April Financial Statement includes valuations for Debtor's ***non-vehicle*** Ford Credit Collateral as of April 31, 2025.

46. Ford Credit also has extensive experience liquidating non-vehicle assets of distressed dealerships, and Ford Credit's processes and procedures for liquidating its non-vehicle collateral include a standard and reliable process for determining the anticipated liquidation value of such collateral as follows:

(a) 55 percent of parts and accessories,

(b) 45 percent of equipment and fixtures,

(c) 75 percent of factory receivables, and

(d) generally, 60 percent of accounts receivable.

47. Based on the foregoing, Ford Credit estimated that Debtor's non-vehicle Ford Credit Collateral was worth, at most, $2,276,000.00 as of April 28, 2026. First Declaration, ¶ 39.

48. Utilizing the Debtor's April 30, 2026 dealer Financial Statement, Ford Credit estimates that Debtor's non-vehicle Ford Credit Collateral is worth, at most, $2,253,241, as follows[1]:

**Non-Vehicle Collateral Value Based Upon April 30, 2026 Dealer Financial Statement**

| | DFS Reported Value | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|
| Parts and Accessories | $1,670,360.00 | $751,662.00 | $918,698.00 |
| Equipment and Fixtures | $1,557,623.00 | $856,692.65 | $700,930.35 |
| Notes and Accounts Receivable | $678,203.00 | $271,281.20 | $406,921.80 |
| Factory Receivables | $302,255.00 | $75,563.75 | $226,691.25 |
| | | | **$2,253,241.40** |

49. As such, as of June 11, 2026, Ford Credit calculates that the total value of the Ford Credit Collateral to be ***approximately*** $22,686,386, exclusive of goodwill/ blue sky, as more specifically set forth below:

[1] Utilizing the Debtor's Schedules, the value of the non-vehicle Ford Credit Collateral could be as low as $226,691.25.

| Financed Vehicle Type | Number of Units | Value | Sold out of Trust | Remaining Vehicles | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|---|---|---|
| New Current | 144 | $9,025,000.00 | $195,000.00 | $8,830,000.00 | $442,000.00 | $8,388,000.00 |
| New Prior Year | 97 | $9,068,000.00 | $1,458,000.00 | $7,610,000.00 | $1,523,000.00 | $6,087,000.00 |
| Units with Modifications | 47 | $4,980,000.00 | $0.00 | $4,980,000.00 | $1,245,000.00 | $3,735,000.00 |
| In-Transit | 2 | $141,000.00 | $0.00 | $141,000.00 | $0.00 | $141,000.00 |
| Demo Current | 1 | $58,000.00 | $0.00 | $58,000.00 | $12,000.00 | $46,000.00 |
| Demo Prior Year | 7 | $489,000.00 | $0.00 | $489,000.00 | $147,000.00 | $342,000.00 |
| P-Cars | 14 | $599,000.00 | $0.00 | $599,000.00 | $180,000.00 | $419,000.00 |
| Used | 13 | $523,000.00 | $0.00 | $523,000.00 | $157,000.00 | $366,000.00 |
| DPP | 57 | $3,150,000.00 | $3,150,000.00 | $0.00 | $0.00 | $0.00 |
| **Total Financed Vehicles** | **382** | **$28,033,000.00** | **$4,803,000.00** | **$23,230,000.00** | **$3,706,000.00** | **$19,524,000.00** |

**All values rounded to the nearest $1,000.00**

| | |
|---|---|
| **TRAC Vehicle Values** | **$286,800.00** |
| **Non-Floored Vehicles** | **$622,345.00** |

**Non-Vehicle Collateral Value Based Upon April 30, 2026 Dealer Financial Statement**

| | DFS Reported Value | Estimated Loss on Recovery | Ford Credit Valuation |
|---|---|---|---|
| **Parts and Accessories** | $1,670,360.00 | $751,662.00 | $918,698.00 |
| **Equipment and Fixtures** | $1,557,623.00 | $856,692.65 | $700,930.35 |
| **Notes and Accounts Receivable** | $678,203.00 | $271,281.20 | $406,921.80 |
| **Factory Receivables** | $302,255.00 | $75,563.75 | $226,691.25 |
| | | | **$2,253,241.40** |

| | |
|---|---|
| **Total Collateral Valuation** | **$22,686,386.40** |

50. Therefore, the value of all of the remaining Ford Credit Collateral is approximately $6,850,358.53 ***less*** than the Ford Credit Indebtedness, as compared to an approximately $5,910,000 shortfall as of April 24, 2026, which calculates to an on average diminution of Ford Credit Collateral of $19,623.19 ***per day***, as follows:

| | Collateral Shortfall | Per Diem Diminution |
|---|---|---|
| Collateral Shortfall as of April 24, 2026 | ($5,908,445.48) | |
| Collateral Shortfall as of June 11, 2026 | ($6,850,358.53) | |
| Diminution of Ford Credit Collateral from April 24 to June 11, 2026 | ($941,913.05) | ($19,623.19) |
| Additional Diminution if Sale Closes by July 23, 2026 (6 wk sale process) | ($824,173.98) | |
| Further Diminution Due to Lack of Binding LOIs and 30 day diligence | ($588,695.70) | |
| | ($2,354,782.73) | |

51. Ford Credit willingly consented to the use of Cash Collateral in hopes of decreasing its collateral shortfall in a sale process, and drafted adequate protection provisions into the Stipulation to enable it to safeguard against diminution in the Ford Credit Collateral by setting an expedited sale process, and inserting objection rights to an LOI to protect it from being economically harmed by a sale process.

52. On account of the Events of Default set forth in the Notice of Default (i.e. lack of binding LOI, an LOI that fails to include sufficient good will/blue sky, and an LOI that fails to include sufficient value to exceed the liquidation value Ford Credit believes it can achieve), and the continuing daily diminution in the value of Ford Credit Collateral – without any way for Debtor to adequately protect Ford Credit – Ford Credit is unwilling to further consent to the use of its Cash Collateral.

Tom Evans